SCHEER LAW GROUP, LLP
REILLY D. WILKINSON #250086
JOSHUA L. SCHEER #242722
155 N. Redwood Drive, Suite 100
San Rafael, CA 94903
Telephone: (415) 491-8900
Facsimile: (415) 491-8910
rwilkinson@scheerlawgroup.com

Attorneys for Plaintiff, NUCAPITAL CORP, a California corporation, CHRIS FRIEDL

UNITED STATES BANKRUPTCY COURT FOR

THE CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>Auri Matzel Vega Torres,<br><br>Debtor. | Bk. No.: 8:26-bk-11462-SC<br><br>Adv. No.:<br><br>Chapter 7 |
| NUCAPITAL CORP, a California corporation<br>and CHRIS FRIEDL,<br><br>Plaintiffs.<br><br>vs.<br><br>Auri Matzel Vega Torres and Velagio Holdings,<br>LLC, and DOES 1 through 10 inclusive,<br><br>Defendants. | **COMPLAINT TO DETERMINE<br>DISCHARGEABILITY OF DEBT**<br><br>**[11 U.S.C. § 523(a)(2); 11 U.S.C. § 523(a)(4);<br>11 U.S.C. § 523(a)(6)]** |

Plaintiffs, NUCAPITAL CORP, a California corporation ("**NUCAPITAL**") and CHRIS

FRIEDL ("**FRIEDL**"), complains and alleges as follows:

**JURISDICTION**

1. This Adversary is brought in connection with the Debtor's case under Chapter 7

of Title 11, Case No. 8:26-bk-11462-SC ("**Bankruptcy**"), now pending in this Court. This

Bankruptcy Court has jurisdiction over this Adversary Proceeding as a "core" proceeding

pursuant to 28 U.S.C. §157, §1334.

COMPLAINT - 1

**VENUE**

2.   Venue is proper pursuant to 28 U.S.C. §1409.

**PARTIES**

3.   Plaintiff, NUCAPITAL, a California corporation is now and at all times herein mentioned was, a California corporation located in Huntington Beach, California.

4.   Plaintiff, FRIEDL is an individual who resides in Orange County, California and is the Chief Executive Officer of NUCAPITAL.  NUCAPITAL and FRIEDL are collectively referred to as "**the Plaintiffs**" herein.

5.   Auri Matzel Vega Torres ("**Debtor**") is, on information and belief, an individual residing in California and the Chapter 7 Debtor herein, a managing member, officer, or de facto controlling person of Velagio Holdings, LLC ("**Velagio**"), residing in California. Plaintiff is informed and believes that Debtor exercised control over Velagio's finances and participated in the fraudulent scheme described herein.

6.   Plaintiff is informed and believes, and on that basis alleges, that Velagio is a real estate holding company with its principal place of business at 139 Sunnyslope, Irvine, CA 92618. Velagio is a limited liability company registered in California.  Debtor is the managing member, officer, or de facto controlling person of Velagio. Velagio is the alter ego of Debtor, and Debtor used Velagio as an instrumentality and conduit to perpetuate fraud, mislead investors and creditors, and avoid individual liability. Debtor and Velagio are collectively referred to as "**the Defendants**" herein.

7.   Debtor filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code on May 12, 2026.  The deadline to file bankruptcy complaints is August 10, 2026.

8.   Weneta M.A. Kosmala ("**Trustee**") has been appointed as the Chapter 7 Trustee in the instant bankruptcy. To the extent that relief sought herein is granted, Trustee should be bound by any such judgment.

//

//

## GENERAL ALLEGATIONS

9.      This matter arises out of a series of fraudulent schemes perpetrated by Debtor, acting under the guise of Velagio, controlled by Debtor, with substantial involvement and direction from Mario Franco ("**Franco**") and Isabelle Raulier ("**Raulier**").

10.      The initial contact between Plaintiffs and Franco occurred on October 5, 2022, and by January 4, 2023, Franco and Debtor began requesting large sums of money from Plaintiffs under the pretense of investment opportunities. Debtor explicitly requested that these funds be wired to her company, Velagio, which she controlled. Franco also directly solicited the funds and orchestrated the transactions, despite having no official role in Velagio on paper.

11.      Debtor and Franco, portrayed themselves as seasoned operators in off-market real estate and international oil trades, purportedly facilitated through Debtor's family connections in Mexico.

12.      Debtor represented to Plaintiffs that their funds would be used exclusively as "proof of funds" to secure large-scale transactions, and would never be spent or transferred without Plaintiffs' consent. Debtor repeatedly emphasized that Plaintiffs would retain full control and oversight of the funds at all times.

13.      Relying on these representations, Plaintiffs wired $270,000.00 to Velagio in January 2023—purportedly to purchase high-end watches as gifts for a Saudi intermediary critical to closing a crude oil deal. The narrative proved entirely fictitious.

14.      In the months that followed, Debtor and Franco proposed opening a "VIP" account at Banorte Bank in Mexico, requiring an initial deposit of $130,000.00. They claimed this account would allow seamless global transfers and facilitate oil-related investments.

15.      In May 2023, Debtor and her associates traveled to Dubai with Plaintiffs' associate, Johannes, to establish Emexo Oil—later rebranded Emexo Global. Raulier, introduced as a trusted local contact, was added as the corporate signatory. Johannes held 62% of the company's shares on behalf of himself and Plaintiffs, who remained the sole capital provider.

16.      In fall 2023, Raulier, a UAE resident, travelled to Irvine, California and resided at Debtor's house for one (1) month. During that time Debtor's associates, including

Franco and Raulier approached a local investor, also known to Plaintiff and Johannes, and proposed an international oil deal. Johannes witnessed that Franco and Raulier provided certain documents and asked the investor for several hundred million dollars. The investor immediately forwarded these documents to experienced oil traders he knows. They came back saying "hands off" because the documents are not legitimate.

17.     In August 2023, acting on Debtor's recommendation, Plaintiff retained Raulier as his paid consultant and representative in the UAE. Between August and October 2023, Plaintiff wired an additional $1,021,640.00 into Raulier's UAE accounts for investments in real estate and oil trading.  Raulier confirmed in writing that she received these funds and would act solely in Plaintiff's interest.

18.     Separately, Plaintiff was solicited to send $150,000.00 and $200,000.00 to Hypomone Inc., purportedly for time-sensitive real estate ventures.

19.     In October 2023, Raulier traveled to the United States and stayed with the Debtor and Franco. During this period, the trio orchestrated the abandonment of Emexo Global and formed a competing entity—Hypomone Trading—in Dubai. Corporate records confirm that Franco was listed as CEO, Raulier as the primary contact, and Debtor as co-founder. They utilized the same infrastructure, web domain, and branding developed for Emexo Global—all funded by Plaintiffs.

20.     On December 16, 2023, Franco explicitly informed Plaintiffs that the funds would not be returned, there were no investment profits, and that he, Debtor, and Raulier had formed Hypomone Trading for their own benefit.

21.     Although Raulier later acknowledged her obligation to repay Plaintiff, she has ceased all communication and retained the funds.

22.     All documents and representations made by Defendants were knowingly false, fabricated, or forged. Defendants used encrypted messaging platforms and multiple devices to coordinate and conceal their fraudulent conduct.

23.     Despite repeated written demands from Plaintiff and his counsel, no funds have been returned.

COMPLAINT - 4

24. Though the contract for the business relationship was nominally between Nucapital and Velagio, the facts establish that Debtor and Franco acted well outside the protection normally afforded to LLC members and should be held personally liable for their conduct.

25. Over the course of 2023, Debtor and her associates induced Plaintiffs to wire a total of $1,130,000.00 to Velagio and, later, $150,000.00 to Franco's Hypomone Inc., and another $200,000.00 to Velagio, under false pretense.

26. Defendants wired $110,000.00 to Sargan Khan upon the request of Plaintiff. In total, Defendants owed $1,370,000.00 to Plaintiffs. These representations made by Defendants included:

i. The existence of profitable watch deals with a Saudi Prince (no documentation ever materialized);

ii. Investment in oil trading through a company to be co-founded with Plaintiffs (Emexo), and;

iii. Secure placement of Plaintiffs' money in a VIP account at Banorte Bank in Mexico.

27. At every step, Debtor made specific personal assurances that the funds would be protected and returned. These assurances were made outside the four corners of the contract, personally by both individuals, often in writing. Notably, Plaintiffs required and Debtor personally signed a Promissory Note acknowledging receipt of funds totaling $1,130,000.00 and promising repayment with 4% yearly interest. Franco was identified in that Note, which reinforces that both individuals recognized their personal obligations.

28. Additionally:

i. Debtor repeatedly directed Plaintiffs to transfer funds to her personally controlled Velagio bank account, account number ending in 1873 at Bank of America and later to a Chase account ending in 0003, bypassing any independent corporate governance.

ii. Franco acted as CEO or de facto officer of Velagio, interfacing directly with Plaintiffs.

iii.    Funds were later diverted to Franco's personal company, Hypomone Inc., and used for separate, undisclosed purposes, including the formation of a competing oil trading company, Hypomone Trading, in Dubai with Debtor and Raulier—all while Franco remained CEO of Emexo and Defendants continued making promises to Plaintiffs about repayment.

iv.    In March 2023, Debtor and Franco each confirmed receipt of funds intended for investment and acknowledged their use and control over those funds, despite their obligation to hold the money for Plaintiffs' benefit.

v.    Plaintiffs were never made an owner or signatory of Velagio, and no shareholder or operating agreement ever disclosed the use of funds or risk of loss, evidencing a complete lack of corporate transparency.

vi.    Debtor commingled personal and company funds, using LLC accounts to pay unrelated parties (e.g., $45,000 loaned to a third party named Sargan, at Plaintiff's direction but with no documentation of repayment).

vii.    Despite multiple requests for documentation of the VIP bank account or proof of secured investments, Defendants failed to provide any, while continuing to assure Plaintiff that everything was proceeding as planned.

29.    All in all, in order to pay Nucapital and formalize the relationship between the parties in this case, Defendant Velagio and NuCapital signed a secured promissory note and Velagio promised to pay $1,163,187.95 on December 01, 2023.

30.    Even after repeated demands—at least ten formal written demands between September 2023 and May 2024—Defendants failed to repay NuCapital. On December 16, 2023, Franco explicitly stated that he and Debtor would not return the money and that the oil and real estate ventures with Plaintiff were over. He further stated they had formed their own separate venture, Hypomone Trading, and that Raulier would keep Plaintiff's money.

31.    Defendants' actions demonstrate a willful misuse of the corporate form, operating Velagio as a mere alter ego for personal dealings and engaging in intentional misrepresentations to induce contractual obligations and receive large sums of money. These facts justify piercing the corporate veil and holding Debtor personally liable for the full amount of Plaintiff's losses.

32. In summary, Plaintiffs have suffered $2,391,640.00 dollars due to the Defendants malicious, fraudulent actions.

### FIRST CAUSE OF ACTION

(Non-Discharge of Debt – Fraud and False Pretenses, 11 U.S.C. § 523(a)(2)(A))

(Against All Defendants)

33. Plaintiff hereby incorporates by reference the allegations set forth in paragraphs 1 through 32 the same as if set forth fully herein.

34. Beginning in or around October 2022, Defendants, along with Franco and Raulier, individually and in concert, intentionally made false representations to Plaintiffs with the intent to defraud them and induce the transfer of substantial funds exceeding $1,370,000.00.

35. Specifically, Defendants represented that Plaintiffs' funds would be used exclusively for legitimate investment purposes, including:

    a. The acquisition of luxury watches for use in a high-level crude oil transaction with a Saudi intermediary;

    b. A secured "VIP" bank account at Banorte Bank in Mexico for global oil transfers;

    c. Investment in off-market real estate; and

    d. Formation and operation of Emexo Oil/Global, a joint oil-trading venture.

36. Defendants further represented that Plaintiffs' funds would remain under Plaintiffs' full control, would not be used without Plaintiffs' express consent, and would be repaid in full. These representations were reinforced in writing, including a signed promissory note executed by Debtor, acknowledging receipt of $1,130,000.00 and promising repayment with interest.

37. These representations were material, and Plaintiffs justifiably relied on them in making a series of wire transfers to Velagio, Hypomone Inc., and UAE accounts controlled by Debtor's associate, Raulier.

38. At the time the representations were made, Defendants knew them to be false. In truth, Defendants never intended to use the funds for the represented purposes, nor did they

intend to return the money. Instead, Defendants diverted the funds to their personal use, including forming a competing entity—Hypomone Trading—without Plaintiffs' knowledge, using infrastructure and assets funded by Plaintiffs.

39. Defendants concealed the fraud through continued misrepresentations, forged documents, encrypted communications, and refusals to provide requested documentation, including bank records and investment agreements.

40. Plaintiffs reliance was reasonable and foreseeable, as the Defendants held themselves out as experienced professionals in international investment and oil trade and maintained the pretense of legitimate business operations through entities such as Velagio and Emexo.

41. As a direct and proximate result of Defendants' fraud, Plaintiffs have sustained damages in an amount exceeding $1,370,000.00, in addition to interest, consequential damages, attorneys' fees, and costs.

42. Defendants acted with malice, oppression, and Plaintiffs are therefore entitled to an award of punitive damages.

43. Defendants individually and as agents and alter egos of Velagio made numerous false representations of material fact to Plaintiffs with knowledge of their falsity and with the specific intent to induce Plaintiffs to act in reliance thereon. These false representations include, without limitation:

    i. Representations concerning non-existent or unverified high-yield investment opportunities, such as watch resales involving a Saudi prince, oil trading ventures, and secured bank placements;

    ii. Personal guarantees of repayment and safety of funds, made in writing and orally, outside any formal corporate contract;

    iii. Misrepresentations about the roles, authority, and corporate structure of Velagio;

    iv. The purported establishment of a company, Emexo, with Plaintiffs as a co-founder—when in fact no such corporate relationship was created or honored;

v.    False documentation, including a signed promissory note that was never intended to be honored.

44.    Plaintiffs reasonably relied on these representations, and in doing so, transferred $1,370,000.00 to Velagio and Hypomone Inc., and accounts controlled by the Debtor and her associates. In addition to that Plaintiff transferred $1,021,640.00 to Raulier due to Defendants' misrepresentations. The said reliance was justified given Defendants' repeated verbal, written, and documented reassurances.

45.    As a direct and proximate result of Defendants' fraud, Plaintiffs have suffered damages in excess of $2,391,640.00, plus accruing interest and consequential losses, all in an amount to be proven at trial. Plaintiffs are also entitled to punitive damages due to the Defendants' malicious, fraudulent, and oppressive conduct.

46.    Because Defendant's actions constitute actual fraud, Defendants' debt to Plaintiffs as alleged herein is nondischargeable pursuant to 11 U.S.C. § 523 (a)(2).

**SECOND CAUSE OF ACTION**

(Non-Discharge of Debt – Embezzlement, 11 U.S.C. 523(a)(4))

(Against All Defendants)

47.    Plaintiff hereby incorporates by reference the allegations set forth in paragraphs 1 through 46 the same as if set forth fully herein.

48.    Plaintiffs and Defendants entered into agreements by which Defendants represented that Plaintiffs' funds would be used exclusively for legitimate investment purposes, including:

a.    The acquisition of luxury watches for use in a high-level crude oil transaction with a Saudi intermediary;

b.    A secured "VIP" bank account at Banorte Bank in Mexico for global oil transfers;

c.    Investment in off-market real estate; and

d.    Formation and operation of Emexo Oil/Global, a joint oil-trading venture.

49.    Defendants further represented that Plaintiffs' funds would remain under Plaintiffs' full control, would not be used without Plaintiffs' express consent, and would be repaid in full.

COMPLAINT - 9

50. Defendants accepted these funds in accordance with their designated use. However, Defendants diverted the funds to their personal use, including forming a competing entity—Hypomone Trading—without Plaintiffs' knowledge, using infrastructure and assets funded by Plaintiffs.

51. As a direct and proximate result of Defendants' fraud, Plaintiffs have suffered damages in excess of $2,391,640.00, plus accruing interest and consequential losses, all in an amount to be proven at trial. Plaintiffs are also entitled to punitive damages due to the Defendants' malicious, fraudulent, and oppressive conduct.

52. Because Defendant's actions constitute actual fraud, Defendants' debt to Plaintiffs as alleged herein is nondischargeable pursuant to 11 U.S.C. § 523 (a)(4).

### THIRD CAUSE OF ACTION

((Non-Discharge of Debt – Willful and Malicious Injury, 11 U.S.C. 523(a)(6)).

(Against All Defendants)

53. Plaintiff hereby incorporates by reference the allegations set forth in paragraphs 1 through 52 the same as if set forth fully herein.

54. Defendants intentionally, deliberately, and wrongfully induced Plaintiffs into parting with their funds through a coordinated scheme of material misrepresentations, concealments, and false promises. Defendants accepted these funds in accordance with their designated use. However, Defendants diverted the funds to their personal use, including forming a competing entity—Hypomone Trading—without Plaintiffs' knowledge, using infrastructure and assets funded by Plaintiffs.

55. Defendants' actions were "willful" within the meaning of 11 U.S.C. § 523(a)(6). Defendant acted with the subjective, actual intent to cause economic injury to Plaintiffs, or with the subjective knowledge that such severe economic injury was substantially certain to result from his deceptive conduct. Defendants deliberately used Plaintiffs' funds for their own personal use and profit.

56. Defendants' actions were "malicious" within the meaning of 11 U.S.C. § 523(a)(6). Defendants' taking and retention of Plaintiffs' funds was an intentional, tortious

violation of Plaintiffs' property rights. Defendants acted deliberately, wrongfully, and without just cause or excuse. Defendants targeted vulnerable funds with the explicit purpose of self-enrichment at the direct expense of Plaintiffs.

57. As a direct and proximate result of Defendants' willful and malicious conduct, Plaintiffs have suffered a severe and permanent financial injury to be determined at trial, including interest, punitive damages due to the Defendants' malicious, fraudulent, and oppressive conduct, attorneys' fees, and costs according to proof.

58. Because this debt arises from the Defendants' deliberate, willful, and malicious injury to Plaintiffs and Plaintiffs' property, the entire obligation is completely non-dischargeable in bankruptcy pursuant to 11 U.S.C. § 523(a)(6).

WHEREFORE, Plaintiff prays for judgment as follows:

### FIRST CAUSE OF ACTION

### (Non-Discharge of Debt Pursuant to 11 U.S.C. § 523(a)(2)(A))

1. For a determination that the debt owed to Plaintiff by Defendant is deemed non-dischargeable pursuant to 11 U.S.C. §523(a)(2)(A).

2. For an order determining that Plaintiff's claims against Defendant are nondischargeable in the amount of $ of $2,391,640.00.

3. For punitive and exemplary damages.

4. That interest at the legal rate be awarded on the above amount from the date of entry of the judgment in these proceedings.

5. Any additional sum as yet unknown, but according to proof.

6. That Plaintiff be awarded attorneys' fees and costs incurred herein.

7. For such other and further relief as the Court may deem just and proper.

### SECOND CAUSE OF ACTION

### (Non-Discharge of Debt Pursuant to 11 U.S.C. § 523(a)(4))

1. For a determination that the debt owed to Plaintiffs by Defendants is deemed non-dischargeable pursuant to 11 U.S.C. §523(a)(4).

2.    For an order determining that Plaintiff's claims against Defendants are nondischargeable in the amount of $ of $2,391,640.00.

3.    For punitive and exemplary damages.

4.    That interest at the legal rate be awarded on the above amount from the date of entry of the judgment in these proceedings.

5.    Any additional sum as yet unknown, but according to proof.

6.    That Plaintiff be awarded attorneys' fees and costs incurred herein.

7.    For such other and further relief as the Court may deem just and proper.

THIRD CAUSE OF ACTION

(Non-Discharge of Debt Pursuant to 11 U.S.C. § 523(a)(6))

1.    For a determination that the debt owed to Plaintiffs by Defendants is deemed non-dischargeable pursuant to 11 U.S.C. §523(a)(6).

2.    For an order determining that Plaintiff's claims against Defendants are nondischargeable in the amount of $2,391,640.00.

3.    For punitive and exemplary damages.

4.    That interest at the legal rate be awarded on the above amount from the date of entry of the judgment in these proceedings.

5.    Any additional sum as yet unknown, but according to proof.

6.    That Plaintiff be awarded attorneys' fees and costs incurred herein.

7.    For such other and further relief as the Court may deem just and proper.

SCHEER LAW GROUP, LLP

Dated: August 10, 2026                    /s/ Reilly D. Wilkinson
                                          #250086

COMPLAINT - 12